RICKY DAVID SECHREST, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 15320

August 27, 1985                                   705 P.2d 626

*David G. Parraguirre,* Public Defender, *Jane G. McKenna,* Deputy Public Defender, Washoe County, for Appellant.

*Brian McKay,* Attorney General, Carson City, *Mills Lane,* District Attorney, *Illyssa I. Fogel,* Deputy District Attorney, Washoe County, for Respondent.

## OPINION

*Per Curiam:*

In April of 1983, Doris Schindler hired Zella Weaver to babysit her ten-year old daughter, Maggie Schindler. In addition to caring for Maggie during weekday afternoons and evenings at the Schindler residence, Mrs. Weaver would pick Maggie up from the Meadowood Ice Arena when Maggie was through ice skating on Saturdays.

On May 14, 1983, a neighbor of the Schindlers' drove Maggie and her friend, Carly Villa, to Meadowood and dropped them off to skate. Later that afternoon Mrs. Weaver went to Meadowood to pick up Maggie and Carly but could not find them. The police were notified, and an investigation was begun.

On June 7, 1983, the bodies of Maggie and Carly were found in Logomarsino Canyon, a remote area east of Reno, by two young men who were out shooting. The bodies, which had been covered with loose dirt, were found about 50 yards apart. A pair of ice skates and skate guards with the name "Maggie S." on them were found near one of the gravesites.

Ricky David Sechrest is Zella Weaver's grandson and lived at her home. Sechrest had been seen outside the Schindler home several times while waiting to pick up his grandmother when she finished babysitting there. The record establishes that Maggie had been at the Weaver residence before and that Sechrest knew that his grandmother routinely picked Maggie up at Meadowood Mall on Saturdays.

On June 14, 1983, Sechrest gave an inculpatory statement to Officer Bogison and Detective Eubanks of the Reno Police Department while he was being questioned at the Sparks Police Department by Sparks police on an unrelated grand larceny charge. He admitted that he had picked up Maggie and Carly from the Meadowood Mall Ice Arena. He said that he asked Maggie if she wanted to go for a ride and that she had agreed. They drove out to Logomarsino Canyon. Sechrest claimed that they were walking around the hills rock hunting when Carly fell over backward and hit her head. Sechrest said he thought the girl was dead because when he checked her pulse, she did not have one. He said Maggie began to "freak out on him" and was "between hysterical and crying." Sechrest stated that he knew it was wrong to be up there with the girls to begin with, so when Maggie began to run he panicked, caught her and hit her over the

back of the head with a rock. After hitting the girl three or four more times with the rock after she had fallen, Sechrest went to his car and got a shovel. He returned to where Carly was lying and thought she was still alive; so he hit her "once or twice" in the head with the edge of the shovel. He then buried the girls with loose dirt. In his statement Sechrest admitted that he performed an act of masturbation on Maggie's body, but, according to him, at this time the girl was already dead.[1]

A jury convicted Sechrest of two counts of first degree murder and two counts of first degree kidnapping. At the penalty phase, the jury set the penalty at death on each murder conviction. In addition the trial judge sentenced Sechrest to life without possibility of parole on each of the two kidnapping counts.

### Constitutional Issues

Sechrest contends that the statement he made to the police, wherein he confessed to the killing, was erroneously admitted into evidence by the trial court in violation of his constitutional rights. We reject this contention.

Pursuant to the investigation of a grand larceny, Sechrest was approached on June 14, 1983 by officers from the Sparks Police Department. Advising Sechrest of his constitutional rights under Miranda v. Arizona, 384 U.S. 436 (1966), Detective Wright asked him if he wanted to talk about the grand larceny charge. Sechrest replied that he wanted an attorney. Officers asked no further questions but took Sechrest to the Sparks Police Department for booking. While waiting to be booked, Sechrest turned to Detective Wright and Sergeant Gonyo and said: "I like you two guys, I don't want an attorney, I will talk to you." The officers proceeded with the booking and afterward Sechrest was given a standard rights waiver form, which he read and signed in the presence of the officers. During questioning Sechrest stated that the Reno Police were investigating him as a possible suspect in a homicide. Sparks Police did not question Sechrest regarding the homicide but, rather, told him that they were only interested in the grand larceny charge.

After the interview was finished, Sergeant Gonyo left the room and then returned to inform Sechrest that Officer Bogison of the Reno Police Department was outside. Sergeant Gonyo asked Sechrest if he would like to talk to Officer Bogison, and Sechrest replied: "Yes, I like Mr. Bogison, he is the only one on my side,

---

[1]At trial a forensic pathologist testified that it was unlikely that Carly fell and killed herself. He also testified that the skull fractures in both children were probably caused by the shovel. He further testified that due to the decomposition of the bodies it would have been impossible to tell if a sexual assault had occurred.

and understands me."[2] Officer Bogison then approached Sechrest and said: "I understand you want to talk to me, is that right?" Sechrest replied: "Yes." Sechrest said that he had spoken with his attorney and had been advised to keep his mouth shut. In response, Bogison said: "Well, there is nothing we can do to alter that, . . . do you want to talk to me?" Sechrest replied: "I will tell you what, I will make a deal—no, I won't make a deal. You ask some questions, and if I want to answer them, I will answer them, and if not, I won't." Bogison then said: "Does this mean you want to talk to us?" Sechrest replied: "Yes."

After the foregoing conversation Officer Bogison, Detective Eubanks and Sechrest entered an interrogation room. Sechrest requested that he be permitted to call his grandmother and also his attorney. After Sechrest spoke with his grandmother, Officer Bogison asked him: "Do you want to talk to your attorney?" Sechrest replied: "No, I want to get this off my chest." He then made the statement in which he confessed to the murders.[3]

Generally, a request by the accused for an attorney is itself an invocation of fifth amendment rights, and police must immediately cease questioning, as the officers correctly did after arresting Sechrest on June 14. Neuschafer v. State, 101 Nev. 331, 705 P.2d 609 (1985); Edwards v. Arizona, 451 U.S. 477 (1981). However, during the booking procedure, Sechrest initiated a conversation with the officers in which he unequivocally eschewed his right to an attorney and agreed to be questioned. The United States Supreme Court has stated that "an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges,*

---

[2]Earlier that evening Detective Eubanks of the Reno Police Department had been contacted by Sechrest's friend, Danny Sportsman. Sportsman told Eubanks that Sechrest wanted to talk to Bogison. Bogison then contacted Mrs. Weaver, Sechrest's grandmother, at her home in a effort to contact Sechrest. Eubanks and Bogison then went to the Sparks Police Department where Sechrest was being questioned in regard to the unrelated grand larceny charge.

[3]The statement of June 14 had been preceded by other conversations between Sechrest and the Reno Police Department. Officer Bogison had spoken with him regarding the homicides as early as June 8. Officer Bogison and Detective Eubanks had also spoken to him the day before, June 13. In Sechrest's statement of June 13, he did not incriminate himself but, rather, maintained an alibi. The June 13 statement was made in response to a request for "background information," and Sechrest was not under arrest or in custody at the time. Near the end of this interview Sechrest stated that he wished to consult an attorney. Officers ceased questioning at this point and told Sechrest to feel free to "reinstitute contact" with them.

*or conversations with the police."* 451 U.S. at 484. (Emphasis added.) It is clear that Sechrest reinstituted a dialogue with the officers at the booking desk, and therefore, that dialogue falls under the *Edwards* rule.

Although Sechrest initiated the communication, we still must consider whether the waiver was knowingly and intelligently made. 451 U.S. at 486 n. 9. After initiating the exchange, Sechrest read and signed a standard waiver form in the presence of the officers. The trial court found the waiver to have been voluntarily made. Considering Sechrest's background, level of comprehension, and dialogue with the authorities, it convincingly appears that the waiver was knowingly and intelligently made and therefore voluntary. There is nothing in the record which would cause us to disturb that determination, and we decline to do so.

After Sechrest agreed to talk to the officers, Sergeant Gonyo of the Sparks Police Department informed Sechrest that Officer Bogison of the Reno Police Department was outside. Sergeant Gonyo asked Sechrest if he would like to speak to Officer Bogison. Sechrest gave an unequivocal, affirmative answer. Officer Bogison then entered the room and asked Sechrest if he wished to speak with him. Again, Sechrest replied affirmatively. Clearly, Sechrest not only initiated the meeting with Officer Bogison, he repeatedly affirmed his desire to speak with Bogison upon Bogison's arrival at the Sparks Police Department. After this Sechrest made what is, at best, an ambiguous request for counsel. Sechrest said that he had spoken with his attorney and had been advised to "keep his mouth shut." Even an equivocal request for counsel by an accused requires that "law enforcement officials must cease the interrogation unless they ask the suspect further questions to clarify whether the suspect wants to consult with an attorney before continuing with the interrogation." United States v. Cherry, 733 F.2d 1124, 1130 (5th Cir. 1984) (citing Nash v. Estelle, 597 F.2d 513, 517 (5th Cir. 1979 (en banc)).

Officer Bogison's response to Sechrest's comment was in the form of a request to clarify. As demonstrated by the above-quoted colloquy between Sechrest and Bogison, Sechrest invited the officers to question him. In a further attempt to clarify Sechrest's intent, Officer Bogison then inquired: "Does this mean you want to talk to us?" Sechrest replied, "Yes." This was adequate clarification of Sechrest's unimpaired willingness to talk to officers in the absence of counsel.

Recently, the United States Supreme Court in Smith v. Illinois, ......... U.S..........., 105 S.Ct. 490 (1985), addressed a case which

presented similar facts. The accused in that case was advised by the police that he had a right to consult with an attorney and to have that attorney present during questioning. The accused responded: "Uh, yeah. I'd like to do that." 105 S.Ct. at 491. Subsequently, in response to further interrogation, the accused agreed to speak with police without consulting an attorney. In reversing the conviction, the Supreme Court stated: "We hold only that, under the clear logical force of settled precedent, an accused's *post-request* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." 105 S.Ct. at 495.

The present case is distinguishable from the *Smith* case because Sechrest did not make such an unambiguous request for an attorney so that Officer Bogison's attempts at clarification were improper. After Sechrest and the officers entered the interrogation room, Sechrest requested that he be allowed to telephone his grandmother and also his attorney. After Sechrest spoke to his grandmother, Officer Bogison asked if he then wished to talk to his attorney. Sechrest replied: "No. I want to get this off my chest." Officer Bogison's question followed Sechrest's telephone conversation with Sechrest's grandmother and was a reasonable attempt to clarify whether Sechrest then still wished to telephone his attorney. Sechrest's answer to the inquiry was clear. Sechrest wanted to get the matter "off his chest." Under these circumstances it cannot be said that officers proceeded with the interrogation in violation of Sechrest's fifth and sixth amendment rights.

Sechrest additionally maintains that at some point during the previous exchanges officers should have once again informed him of his Miranda rights. This argument fails to take into consideration the factual circumstances surrounding Sechrest's statement. Several times prior to making the statement Sechrest was asked if he desired an attorney. He repeatedly rejected the opportunity to have one present during questioning. The record makes it clear that Sechrest not only knew and understood his right to counsel but that he also knowingly and intelligently waived that right. Taylor v. State, 96 Nev. 385, 609 P.2d 1238 (1980).

We conclude that admission of the confession by the trial court for use as substantive evidence of guilt was not error.

Even without the confession there is sufficient evidence of Sechrest's guilt to support his conviction. Tanya Wagner, the friend with whom Maggie and Carly skated that day, identified

Sechrest in court as the man who picked up Maggie and Carly at Meadowood. Sechrest knew the victims and was familiar with Logomarsino Canyon. Police found a bloodstained shovel at Sechrest's residence which a forensic pathologist testified was consistent with the victims' skull fractures. Additionally, fibers found at the gravesites were consistent with fibers taken from Sechrest's car.

### Right to Additional Counsel

Sechrest next argues that it was an abuse of discretion for the trial court to deny his request for an additional attorney to represent him. We conclude otherwise.

On June 30, 1983, defense counsel filed a motion for appointment of another attorney to assist him in Sechrest's defense. The reasons given for requesting additional counsel were: complexity of the issues, severity of penalty, and other special circumstances. The court denied the motion. Counsel asked leave to renew the motion for appointment of additional counsel at a later date. However, the motion was never renewed. Trial was set for September 12, 1983, and proceeded without further defense objection.

NRS 260.060[4] authorizes the appointment of additional counsel. However, the permissive language of the statute indicates that such appointment is discretionary with the trial court. Sechrest cites two California cases for the proposition that in appropriate circumstances a defendant in a capital case should have a second court-appointed attorney. In People v. Jackson, 681 P.2d 149 (Cal. 1980), the California Supreme Court held that the defendant in a death penalty case had failed to furnish any specific compelling reasons for the appointment of additional counsel. Noting that neither the facts nor legal issues were so complex as to require additional counsel as a matter of law, the court concluded that the trial court acted within its discretion in denying the defendant's motion to appoint additional counsel. In Keenan v. Superior Court, 640 P.2d 108 (Cal. 1983), the California Supreme Court held that denial of the motion for additional counsel was an abuse of discretion on the facts of that case but emphasized that the decision was still a discretionary one. The facts of *Keenan* are distinguishable from the instant case. In *Keenan* the defense stated it would be necessary to interview approximately 120 witnesses to prepare a meritorious defense. Investigation had to be done with regard to other crimes with which the defendant was charged. Defense counsel also argued

---

[4]NRS 260.060: For cause, the magistrate or district court *may,* on its own motion or upon the motion of the public defender or the indigent person, appoint and compensate out of county funds an attorney *other than, or in addition to,* the public defender. . . . (Emphasis added).

that he would make numerous pre-trial motions, and despite his objection, a trial date was set seven weeks thereafter.

In the instant case there were few pre-trial motions, including the request for an additional attorney. The defense theory was that Sechrest had indeed killed the girls and raised as a defense only the absence of deliberation and premeditation. This theory eliminated the need for much of the investigatory work that would normally have to be done. The state ultimately called only twenty-one witnesses, and the trial only lasted one and one-half weeks. Additionally, defense counsel was able to employ the services of a student legal research assistant.

We conclude that although a capital case represents a complex form of litigation, these facts make it clear that an undue degree of preparation and investigation was not required, nor was an unreasonable burden placed on Sechrest's counsel. Indeed, as previously noted, defense counsel never sought to renew the motion for additional counsel. Under the facts of this case we find no abuse of discretion.

### Prosecutorial Misconduct

Sechrest finally raises an issue of prosecutorial misconduct. He cites as prejudicial error several remarks the prosecutor made to the jury concerning an instruction which informed the jury of the power of the State Board of Pardons Commissioners to modify any sentence the jury imposed.[5] We have carefully examined the statements and the context in which they were made. We conclude that they do not either individually or cumulatively rise to the level of prejudicial error warranting reversal.

### Proportionality

We have reviewed our other cases in which the sentence of death has been imposed to determine whether Sechrest's sentence is disproportionate. Our review leads us to conclude that the sentence of death is not disproportionate in this case when considered in light of the nature of the murders and the lack of mitigating factors which might possibly militate against the sentence of death.

We also conclude from the record that the sentences of death were not imposed under the influence of passion, prejudice or any arbitrary factor. NRS 177.055(2)(c).

---

[5]Sechrest also argues that the giving of the instruction itself was error. We have previously decided this issue. *See* Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985).

We have carefully examined the remaining contentions of error and conclude that they are without merit. In sum, Sechrest was fairly tried, convicted and sentenced. The judgment of the trial court is, in all respects, affirmed.