OPINION

Per Curiam:

Appellant Shawn Russell Harte, in connection with co-defendants Latisha Babb and Weston Sirex, was indicted, tried before a jury and convicted of first-degree murder with the use of a deadly weapon and robbery with the use of a deadly weapon. For the murder, the jury returned a verdict of death.
Harte contends on appeal that his conviction must be reversed and his judgment of death vacated because the district court erred by: (1) denying Harte’s motion to suppress his confession as obtained without a valid waiver of rights and in violation of Harte’s right to counsel; (2) granting the State’s motion to exclude Harte’s expert witnesses from testifying during the penalty phase; and (3) permitting the State during the penalty phase to introduce evidence of Harte’s statements to show future dangerousness and permitting the State to argue his future dangerousness based upon that evidence. We affirm Harte’s conviction and sentence.

FACTS

On October 14, 1997, two men were traveling toward Fallon in a vehicle loaded with their personal belongings on U.S. 95 when their vehicle was shot multiple times. The shooting resulted in damage to the vehicle including five bullet holes and two shattered windows. When the men arrived in Fallon, they reported the shooting incident to law enforcement officials. Churchill County Sheriff’s Department (CCSD) deputies investigated the crime scene and found a radio scanner, bullet casings, shoe tracks and distinctive tire tracks.[1]
*1058 Twelve days later, on October 26, 1997, sometime between 4:30 and 5:00 a.m., a supervisor of the Reno-Sparks Cab Company became aware that a company taxicab and driver, John Castro, had been missing since midnight. Local law enforcement agencies were notified, and a search was organized to find Castro and the missing taxicab. Meanwhile, between midnight and 6:00 a.m., several Cold Springs residents had noticed a Reno-Sparks taxicab parked on a neighborhood street. Ultimately, around 6:00 a.m., one resident discovered that the taxicab appeared to be occupied by a driver who was sleeping behind the wheel. This resident reported his discovery to the Reno-Sparks Cab Company, which, in turn, notified the Washoe County Sheriff’s Department (WCSD).
WCSD deputies were dispatched to the missing taxicab’s location shortly after 6:30 a.m. On arrival they found taxicab driver Castro slumped over in the driver’s seat. Castro had a major wound in the back of his head and a large amount of blood coming from his nose and mouth; however, he was still alive and making raspy breathing sounds. Following Castro’s transport to a hospital for medical attention, crime scene investigators collected a .22 caliber bullet casing from inside the taxicab.
Castro died within twenty-four hours. An autopsy revealed that the cause of death was a contact gunshot wound to the right-hand side of the back of Castro’s head resulting in brain death.
Back in Churchill County, the investigation of the shooting on U.S. 95 led deputies to obtain a search warrant for appellant Harte’s apartment, another residence, and his vehicle, which was believed to have been used by the perpetrators. On the evening of November 12, 1997, CCSD deputies conducted a traffic stop of Harte’s vehicle, which was driven by Harte and also occupied by Latisha Babb and her child. Harte was advised of the search warrant and asked to accompany deputies to CCSD, where he was ultimately taken into custody.
During searches of Harte’s vehicle, deputies recovered a .22 caliber pistol, which was later shown to have fired the bullet casing recovered from the taxicab driven by Castro at the time of his murder. Also in the vehicle were a magazine with .22 caliber bullets, other ammunition and radio scanners. During the search of Harte’s residence, which he shared with Babb, deputies found in Harte’s bedroom a wireless microphone, shoes with treads similar to the tread tracks found at the scene of the U.S. 95 shooting, and two rifles, one of which used ammunition consistent with the shell evidence found at the U.S. 95 crime scene. Also discovered *1059 in Harte’s bedroom were newspaper stories about the Churchill County shooting and Castro’s murder.
From their investigation on November 12, CCSD deputies suspected that Weston Sirex was involved in the Churchill County shooting. During the late evening hours, deputies went to Reno to locate and interview Sirex. Deputies met with Sirex at his place of employment, Whittlesea Taxi Company. There, a deputy explained to Sirex that another suspect was in custody in Fallon and that the deputy wanted to hear Sirex’s side of the story. In response, Sirex became visibly shaken and talked about going north on Cold Springs Road, and stated that it started out to be a robbery and he was looking out the window when he saw the flash and heard the bang. As a result of these comments, he was asked to accompany deputies to WCSD.
During the early morning hours of November 13, 1997, Sirex was interviewed by WCSD deputies regarding Castro’s murder. Sirex admitted to being involved in robbing and murdering Castro. According to Sirex, a Reno-Sparks taxicab was targeted for the robbery because that company did not have the Global Positioning System that would allow for locating the taxicab if an alarm was set off. He stated, “Initially it was just going to be just to rob him, not to kill him unless absolutely necessary. But I didn’t see that happening. Then as we were headed down Cold Springs Drive, I was looking out the window, I heard the gun go off. I looked over just in time to see his head go down.” Sirex thought they would shoot the taxicab driver for any kind of resistance, although Castro never offered any and did not even know he was being robbed prior to being shot. Sirex further admitted to carrying a .22 caliber handgun during the robbery and to taking from the taxicab and keeping at his residence various items including a pouch containing $84.00 and Castro’s wallet. Sirex also admitted to being involved in the Churchill County shooting. Sirex was arrested for Castro’s robbery and murder.
WCSD deputies searched Sirex’s residence and seized a loaded .22 caliber pistol; a small pouch containing a map book cover, which was partially burned and bore writing which appeared to state “John Castro,” an empty brown wallet that Sirex identified as Castro’s, and miscellaneous personal items; a map directory book for the Reno-Sparks area; a clipboard; a black organizer with a Reno-Sparks Cab Company business card inside it; and a Reno-Sparks Cab Company slip.
WCSD deputies also went to Churchill County to interview Harte, who was in custody, and Babb. Both Harte and Babb admitted to being involved in Castro’s murder; Harte admitted to shooting Castro in the head. Both Harte and Babb also admitted their involvement in the Churchill County shooting incident; *1060 Harte stated he shot at the vehicle for the purpose of robbing its occupants. Ultimately, Harte and Babb were arrested for Castro’s murder and robbery.
In November 1997, Babb granted an interview to a reporter for the Reno Gazette Journal. In the interview, Babb stated:
I was the driver. It was maybe a 15-minute plan. We weren’t out to get this specific person. I jokingly said, “Let’s rob a cab. It’s easy enough.” So we did. I didn’t hear the gunshot. I didn’t even know he was shot until I pulled up alongside the car and heard him (the driver) breathing. The cab stopped in Cold Springs, and I pulled in front of it. I looked and saw him in the front seat with his head rolled back. When I thought about it later, I kept hearing his breath. I thought maybe someone else would rob a cab and they’d think he did it. . . .
Harte, Babb, and Sirex were indicted by a grand jury for murder with the use of a deadly weapon and robbery with the use of a deadly weapon. The State filed a notice of intent to seek the death penalty, alleging two aggravating circumstances: (1) the murder was committed in the commission of or attempt to commit robbery with the use of a firearm, see NRS 200.033(4); and (2) the murder was committed to avoid arrest and prosecution, see generally NRS 200.033(5).
The three defendants were each appointed separate counsel. While awaiting trial, in October 1998, Harte sent a letter to a former girlfriend, which stated in part:
So this cab driver is just spurting off his mouth about how he got “ripped of” [sic] $1000 cash earlier, blah, blah, blah. Now what could that all have been about? Drugs. Fuck this piece of shit. Its [sic] because of people like him that I don’t have a son or daughter. Fuck him.
I chambered a round. A CCI Stinger. .22 caliber hyper-velocity hollow-pointed LubNloy-coated 40 grain slug fired out of my Smith & Wesson semi-auto with 4 inch barrel. Point blank. An inch above the ear and two behind.
Boom. That simple. That easy. No REMORSE. Honestly.
I jumped up front and let the cab coast right in front of a drug dealers [sic] house in Cold Springs. Perfect. Windows were up, so it was noiseless (except that ringing in my ears!) Got out. Dark neighborhood, dark car. ... We left. Went to Circus Circus. Played some games, gambled — continued our good time. Went to Taco Bell . . . and ate. Went home. Simple.
*1061 Nothing to it. Just another chore, like taking out the trash, except easier. And funner.
In March 1999, the case against Harte, Babb and Sirex proceeded to a joint jury trial. The trial resulted in guilty verdicts against Harte and his co-defendants of first-degree murder with the use of a deadly weapon and robbery with the use of a deadly weapon.
In addition to some of the evidence discussed above, during the penalty hearing, the State presented victim impact evidence, evidence relating to the Churchill County shooting incident, and, over Harte’s objection, another portion of the letter written by Harte in October 1998. In the letter, Harte wrote about his plans to organize prisoners and escape from prison.
Harte’s mother testified on his behalf to show mitigation. This testimony showed that at the time of the hearing Harte was twenty-one years old. He had finished his sophomore year of high school before getting his G.E.D. and joining the United States Army. He served nearly two years in the Army, and since returning home had enrolled in college and maintained employment. Further, he had no significant prior criminal record and had a supportive family. Harte declined to make a statement in allocution.
The jury returned a verdict of death against Harte, finding as an aggravating circumstance that the murder was committed in the course of a robbery and that any mitigating circumstances were not sufficient to outweigh the aggravating circumstances.[2] The district court further sentenced Harte for the robbery with the use of a deadly weapon to two consecutive terms of imprisonment for a maximum term of 180 months with a minimum parole eligibility of 72 months to run concurrently with the murder sentence. The court entered its judgment of conviction on May 7, 1999. Harte timely appealed.

DISCUSSION

Denial of Harte’s motion to suppress statements

Prior to trial, Harte moved the district court to suppress his incriminating statements made during the November 13, 1997, interview with WCSD deputies while Harte was in custody in Churchill County for the shooting on U.S. 95. Harte argued that his waiver of Miranda[3] rights was invalid and that his statements were obtained in violation of his right to counsel.
The district court conducted an evidentiary hearing and denied Harte’s motion to suppress. The court found that Harte made *1062 a knowing, voluntary and intelligent waiver of rights. The court further found that Harte did not clearly invoke the right to counsel during the interview; therefore, the court concluded, deputies did not violate Harte’s right to counsel by continuing to question him. Our review of the record supports the district court’s determination.

Whether Harte’s initial waiver of rights was valid

Harte first argues that the district court erred in determining that he validly waived his Miranda rights. He specifically contends that his statements, discussed below, show confusion regarding his rights. We conclude that the record supports the district court’s finding of a valid waiver.
The State bears the burden of showing by a preponderance of the evidence that the defendant knowingly and intelligently waived his Fifth Amendment rights after receiving Miranda warnings. Falcon v. State, 110 Nev. 530, 534, 874 P.2d 772, 775 (1994). The validity of the waiver must be determined in each case based on the particular facts and circumstances presented including the background, experience and conduct of the accused. Anderson v. State, 109 Nev. 1129, 1133, 865 P.2d 318, 320 (1993) (citing Edwards v. Arizona, 451 U.S. 477 (1981)).
The record from the evidentiary hearing shows that Harte was twenty years old at the time of the interview, was relatively educated and intelligent, and was able to communicate well. There is no indication that he was coerced into making incriminating statements. See generally Elvik v. State, 114 Nev. 883, 891-93, 965 P.2d 281, 286-88 (1998). Before Harte agreed to talk to deputies, he was verbally advised of his Miranda rights and specifically indicated orally and in writing, by signing an advisement form, that he understood his rights.
To support his claim that the record does not show that he understood his rights sufficiently to validly waive them, Harte points to the following emphasized comments, which he made following preliminary questioning:
[HARTE]: Just out of curiosity, when do I get to talk to a lawyer? Cuz, I’ve been like talked to several times now. It’s kinna going in circles.
[DEPUTY]: . . . okay. Well, that’s the whole idea of the rights there if you don’t . .
[HARTE]: Yeah.
[DEPUTY]: . . . want to talk to us that’s fine. Yeah. You know, that . . that’s the whole idea of the rights. That’s why.
*1063 [HARTE]: Yeah, yeah, I . .
[DEPUTY]: If you wanna talk to us or.
[HARTE]: . . I. . they . . they told me, you know, that they thought I should talk to a lawyer or whatever. So, I just
[DEPUTY]: Who’s they?
[HARTE]: Um . . the other guy that interviewed me yesterday. Just . . all the people I’ve been talkin’ to ánd whatnot.
[DEPUTY]: Okay. This is a separate case. You wanna talk to us?
[HARTE]: Sure.
[DEPUTY]: Okay.
[DEPUTY]: You can stop at any time.
[HARTE]: Uh huh.
(Emphasis added.)
We do not agree that these comments by Harte undermine the validity of his waiver of rights. While the comments might indicate some initial confusion, Harte was immediately reminded of his rights. Moreover, Harte’s subsequent comments indicate he understood that he could invoke the right to counsel and refuse to answer questions. For instance, during the questioning that followed the above exchange, Harte told deputies, “[Y]ou guys are askin’ me some serious questions here. You know, I don’t wanna . . I don’t wanna be a bitch and say, you know, give my [sic] lawyer. But I mean.” Harte also told deputies that he did not want to incriminate himself based on deputies’ “bullshitting,” and, therefore, before he would give them any information, he wanted deputies to share with him their knowledge regarding the circumstances of the crime. Thus, Harte’s own comments demonstrate that he understood that whether to proceed with the interview and whether to do so without the assistance of counsel were entirely within his discretion.
As further support for his contention, Harte relies upon another portion of the interview wherein he made the following emphasized comments:
[HARTE]: Uh huh. What do you think a lawyer would tell me right now?
[DEPUTY]: I’m not a lawyer.
[HARTE]: I’m sure you’ve been around lawyers. I mean .. I.. I don’t wanna incriminate myself but .. ah . .
[DEPUTY]: [ ] So tell us what happened in the cab. Where’d you go?
*1064 You know it’s right, there. You know you want to tell us the truth. You’re not a bad guy.
[HARTE]: Oh, yeah. You knew that and I know that but if I say anything then . . if I don’t say anything it’s just gonna make it worse and if I do anything it could incriminate myself and I. . I think you understand where I’m cornin’ from. Just .. ah . .
(Emphasis added.) Harte also points to his subsequent question to deputies, “[I]s this recorded at all? Is what I tell you . . can this be used in court?”
However, again, Harte’s comments do not indicate that he did not understand his rights. Rather, the comments, in context, support the determination that Harte understood that he had the right to counsel and to refuse to answer questions. It is apparent that he chose not to invoke those rights during the interview based on his assessment of how much incriminating evidence deputies already possessed. For instance, following the above-emphasized statements, Harte told deputies that if they wished ‘ ‘to get to the bottom of things,” they should state two specific facts that only Sirex would know. Deputies told Harte that they knew about a body microphone that he wore during the crime and knew that Babb was following the taxicab and listening during the crime. When Harte later made a full confession, he stated that he would tell deputies what happened since they knew more than they could without being told by one of the participants and that Harte had to make sure deputies “got” him before he “blab[bed].” Afterward, Harte acknowledged that he felt better talking about the crime. Thus, our review of the record does not demonstrate any real confusion regarding his rights, but instead shows that he was contemplating his options with regard to exercising those rights.
Additionally, Harte’s question regarding whether his statements were being recorded does not demonstrate, as he argues, his confusion regarding whether his statements to deputies could be used against him. This question was immediately followed by Harte’s explanation to detectives that he would appreciate it if they would turn off the recorder. He stated, 1 ‘It just kinna bothers me. I mean two detectives’ word against me.” In context, Harte’s question simply appears to indicate his concern with whether the tape-recording, versus the mere “word” of two deputies, would be used against him. Prior to the interview, Harte was informed that anything he said during the interview could and would be used against him in court. During the interview, he made several references to the fact that by giving a statement he would incrimi *1065 nate himself. Additionally, after confessing, he agreed to a subsequent interview by Churchill County deputies, stating that he had already admitted the Churchill County incident during the instant interview and that what he had said could be used against him in court. Accordingly, Harte’s contention lacks merit.
We conclude that, considering the facts and circumstances here, the district court did not err in determining that Harte made a voluntary, knowing and intelligent waiver of rights.

Whether Harte’s confession was obtained in violation of his right to counsel

Harte also argues that he requested counsel, albeit ambigú-. ously, during the interview; therefore, relying principally on Sechrest v. State, 101 Nev. 360, 705 P.2d 626 (1985), he contends that deputies were prohibited from continuing with the interview without first clarifying whether Harte was invoking his right to counsel. We disagree.
A district court’s determination of whether a defendant requested counsel prior to questioning will not be disturbed on appeal if supported by substantial evidence. Tomarchio v. State, 99 Nev. 572, 575, 665 P.2d 804, 806 (1983).
In Edwards v. Arizona, 451 U.S. 477, 484-85 (1981), the United States Supreme Court held that in order to protect the Fifth Amendment right to counsel recognized in Miranda, once an accused has expressed a desire to deal with police only through counsel, he is not subject to further interrogation until counsel has been made available to him, unless the accused himself initiates further communication with police. If the police continue their interrogation after the suspect invokes his right to counsel, his statements are presumed involuntary and are inadmissible as substantive evidence at trial. McNeil v. Wisconsin, 501 U.S. 171, 177 (1991); accord Boehm v. State, 113 Nev. 910, 915, 944 P.2d 269, 272 (1997).
At the time Sechrest was decided, the United States Supreme Court had not addressed the issue of continued questioning following an ambiguous request for counsel, although various approaches had been developed by state and lower federal courts. See Davis v. United States, 512 U.S. 452, 456 (1994). In addressing the issue in Sechrest, we applied the rule adopted by the Fifth Circuit Court of Appeals: “Even an equivocal request for counsel by an accused requires that ‘law enforcement officials must *1066 cease the interrogation unless they ask the suspect further questions to clarify whether the suspect wants to consult with an attorney before continuing with the interrogation.’” Sechrest, 101 Nev. at 365, 705 P.2d at 630 (quoting United States v. Cherry, 733 F.2d 1124, 1130 (5th Cir. 1984)).
We need not determine, however, as Harte suggests, whether deputies violated the rule recognized in Sechrest that permits only clarification questioning after an ambiguous reference to counsel. Subsequent to this court’s decision in Sechrest, the Supreme Court, recognizing a division among the lower courts, granted certiorari in Davis v. United States, 512 U.S. 452 (1994), to decide how law enforcement officers must respond when a suspect makes a reference to counsel that is insufficiently clear to invoke the Edwards prohibition on further questioning. See id. at 454, 456.
The Court held that the Edwards rule, which requires cessation of the interview if a suspect requests counsel at any time during the interview, applies only where a suspect has actually invoked his right to counsel. Id. at 458-59. The determination must be made on an objective basis. Id. To require cessation of questioning, “the suspect must unambiguously request counsel” by articulating
his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, Edwards does not require that the officers stop questioning the suspect.
Davis, 512 U.S. at 459 (citing Moran v. Burbine, 475 U.S. 412, 433 n.4 (1986)); accord Boehm, 113 Nev. at 915, 944 P.2d at 272 (to invoke the Fifth Amendment right to counsel during a custodial interrogation, a suspect ‘ ‘must make some statement that ‘can reasonably be construed to be an expression of a desire for the presence of an attorney’ ” (quoting McNeil, 501 U.S. at 178)). “[A] reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel” is not sufficient. Davis, 512 U.S. at 459. The Court explained that the Edwards rule is designed to ensure that police will not badger a defendant into waiving his previously asserted Miranda rights. Id. at 458. However, requiring cessation of an interview when the questioning officers do not reasonably know whether the suspect wants an attorney, “‘would transform the Miranda safeguards into wholly irrational obstacles to legitimate *1067 police investigative activity.’ ” Id. at 460 (quoting Michigan v. Mosley, 423 U.S. 96, 102 (1975)). The Court recognized that when a suspect makes an ambiguous or equivocal statement “it will often be good police practice” for the interviewing officers to ask clarifying questions. Id. at 461. The Court declined, however, to adopt a rule requiring officers to ask clarifying questions, instead holding that “after a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney.” Id. at 461.
We hold that the rule announced in Davis applies to custodial interrogations in Nevada, and we approve of the district court’s application of the Davis holding in the instant case. Accordingly, we hereby overrule Sechrest to the extent that it prohibits questioning beyond clarifying questions after an ambiguous request for counsel. Cf. Coleman v. Singletary, 30 F.3d 1420, 1424 (11th Cir. 1994) (recognizing that pursuant to Davis decision, rule formerly applied in the Eleventh Circuit permitting only clarification questioning after ambiguous request for counsel is no longer good law).
Harte contends that his case may be distinguished from Davis, because there, the interview continued for an hour and a half before the suspect made his ambiguous reference to counsel, see Davis, 512 U.S. at 455; whereas, almost immediately Harte asked, “Just out of curiosity, when do I get to talk to a lawyer?” Immediately following this, Harte said, “I . . they . . they told me, you know, that they thought I should talk to a lawyer or whatever.” Later in the interrogation, Harte said, “I don’t wanna be a bitch and say, you know, give my [sic] lawyer. But I mean.” Following that, Harte stated, “What do you think a lawyer would tell me right now?” Harte therefore suggests that because he continued to refer to counsel throughout the interview, deputies were required to clarify whether he desired counsel before resuming questioning.
However, the Court’s holding in Davis focused on the clarity of the request for counsel, and not its timing. Pursuant to Davis, interviewing officers are not required to clarify whether or not the suspect actually wants an attorney before resuming questioning. Moreover, here deputies did remind Harte of his rights and also clarified whether he wanted to talk to them after he made his first statements referring to counsel. Harte replied, “Sure.” Deputies further reminded Harte that he could stop the interview at any time. Thereafter, Harte never clearly requested counsel, and his references to counsel were so equivocal and ambiguous that no *1068 reasonable police officer in the circumstances would understand those references to be a request for an attorney.
We conclude that substantial evidence supports the district court’s determination that Harte did not invoke his right to counsel. Therefore, deputies did not violate Harte’s right to counsel by continuing with the interview.[4]

Exclusion of testimony at the penalty phase regarding various religions’ objections to the death penalty

Harte filed a pretrial notice of intent to call four “expert” witnesses who would testify in the event of a penalty phase to various religions’ moral, ethical and religious objections to the death penalty. The State moved to exclude these witnesses’ testimony. The district court heard argument on the motion outside the jury’s presence, and Harte provided an offer of proof through the testimony of three of the proposed witnesses, a pastor of a Lutheran Church, a Catholic priest, and a rabbi of the Jewish Reform Movement. Each testified as to the reasons for his religion’s opposition to the death penalty. However, none of the proposed witnesses had any personal knowledge regarding Harte or his co-defendants. The district court subsequently granted the State’s motion to exclude the testimony of Harte’s proposed witnesses.
Harte challenges the district court’s ruling and argues that the excluded testimony was admissible pursuant to cases interpreting Eighth Amendment requirements at sentencing. He also argues this evidence was admissible pursuant to Nevada statutes governing capital-case sentencing, specifically, NRS 175.552(3), which permits presentation of evidence on mitigating circumstances as well as evidence “on any other matter which the court deems relevant to sentence,”[5] and the catchall provision at subsection (7) of NRS 200.035, which provides that, in addition to mitigating circumstances identified in subsections (1) through (6), “[a]ny other mitigating circumstance” may be considered. Harte’s contentions lack merit.
*1069 The decision to admit particular evidence during the penalty phase is within the district court’s sound discretion and will not be overturned absent abuse of that discretion. Parker v. State, 109 Nev. 383, 391, 849 P.2d 1062, 1067 (1993).
The Eighth and Fourteenth Amendments require that a sen-tencer in a capital case must not be precluded from considering as a mitigating factor “ ‘any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.’ ’ ’ Eddings v. Oklahoma, 455 U.S. 104, 110 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604 (1978) (plurality opinion of Burger, C.J.)); Skipper v. South Carolina, 476 U.S. 1, 4 (1986); accord Wilson v. State, 105 Nev. 110, 115, 771 P.2d 583, 586 (1989). This constitutional rule does not, however, limit “the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant’s character, prior record, or the circumstances of his offense.” Lockett, 438 U.S. at 604 n.12 (plurality opinion of Burger, C.J.); see also Scott v. Dugger, 891 F.2d 800, 806 (11th Cir. 1989) (and cases cited therein). Therefore, there is no constitutional error in rejecting evidence sought to be introduced in the penalty phase that relates only generally to sentencing options but does not specifically bear on the defendant or his offense. See, e.g., Sonner v. State, 112 Nev. 1328, 1341-42, 930 P.2d 707, 716 (1996) (rejecting constitutional challenge to district court’s exclusion on the basis of irrelevancy of evidence from prison inmate regarding consequences of serving life sentence without possibility of parole), modified in part on other grounds on rehearing, 114 Nev. 321, 955 P.2d 673, cert. denied, 525 U.S. 886 (1998).
We agree with other courts that have rejected constitutional challenges to the exclusion of similar evidence relating only generally to the merits of capital punishment. See, e.g., Glass v. Butler, 820 F.2d 112, 115-16 (5th Cir. 1987) (concluding exclusion of testimony related to religious opposition to death penalty did not constitute error); Kordenbrock v. Scroggy, 680 F. Supp. 867, 888-90 (E.D. Ky. 1988) (upholding exclusion of testimony on, inter alia, historical evolution of moral thought regarding capital punishment and on ethical and religious objections to capital punishment), rev’d on other grounds by 919 F.2d 1091 (6th Cir. 1990); Evans v. Thigpen, 631 F. Supp. 274, 285-86 (S.D. Miss. 1986) (upholding exclusion of minister’s proffered testimony on various churches’ opposition to capital punishment and biblical teachings in that regard), aff’d by 809 F.2d 239 (5th Cir. 1987). *1070 Such generalized evidence should be excluded because it “is not designed to help the sentencer focus on the unique characteristics of a particular capital defendant or crime. Rather, such evidence is designed to persuade the sentencer that the legislature erred, in whole or in part, when it enacted a death penalty statute.” Martin v. Wainwright, 770 F.2d 918, 936 (11th Cir. 1985) (footnote omitted), modified in part on other grounds on rehearing by 781 F.2d 185 (11th Cir. 1986). This sort of evidence “might commend itself to a legislative body considering adoption or retention of the death penalty, but it has no bearing on the question whether a particular defendant . . . should receive death or some lesser authorized penalty.” Stokes v. Armontrout, 851 F.2d 1085, 1096 (8th Cir. 1988).
Moreover, we hold that neither NRS 175.552(3) nor NRS 200.035(7) requires the district court to admit evidence that is not required to be admitted pursuant to constitutional dictates. We have interpreted the scope of admissibility for evidence offered in the penalty phase of capital trials under these statutory provisions as consistent with the admissibility parameters under the constitutional rule. See, e.g., Hollaway v. State, 116 Nev. 732, 745-46, 6 P.3d 987, 996-97 (2000) (pursuant to constitutional rule, NRS 175.552(3) and NRS 200.035(7), evidence presented in mitigation must be relevant to the offense, defendant or victim; “other matter” evidence referred to in NRS 175.552(3) is subject to the same relevancy test); Collman v. State, 116 Nev. 687, 725, 7 P.3d 426, 450 (2000) (concluding that neither NRS 175.552(3) nor case law interpreting constitutional rule requires admission of evidence irrelevant to victim, defendant, or offense); Sonner, 112 Nev. at 1341-42, 930 P.2d at 716 (rejecting constitutional challenge to exclusion of evidence irrelevant to sentencing and therefore not admissible under NRS 175.552(3)); see also McKenna v. State, 101 Nev. 338, 347 & n. 11, 705 P.2d 614, 620 & n.11 (1985) (recognizing that trial court should interpret mitigating evidence broadly under constitutional rule, NRS 175.552 and NRS 200.035(7)).
For these reasons, we conclude that the district court did not err in excluding as irrelevant the testimony of Harte’s proposed witnesses.

Evidence and argument on future dangerousness

During the penalty phase, the district court admitted into evidence, over Harte’s objection, a second excerpt of the letter sent by Harte to his former girlfriend in October 1998. The excerpt stated:
*1071 Prison is just a whole new opportunity. I’m young, so I don’t expect automatic respect. Buy [sic] when people realize my intelligence and knowledge, I become a god. I will TEMPORARILY unite all races in prison and teach that “prisoner” is a race and that anyone trying to keep us imprisoned is another race. I will create a system and have reps from each race or “clique.” Freedom will be obtained.
I will first see the chances of just myself escaping, or perhaps a few. But mass people riots just sounds so much fon.
During closing argument, the prosecutor argued that Harte deserved to be sentenced to death based on his future dangerousness as evidenced by his stated desire to escape from prison as well as his violent character as shown by the circumstances of the instant crime and the Churchill County shooting.
Harte claims that the district court erred by admitting into evidence Harte’s statements, which he contends were unfairly prejudicial, and by permitting the prosecutor to rely on these statements as support for his argument that Harte presented a future danger to society. We disagree. Evidence of a defendant’s character and specific instances of conduct is admissible in the penalty phase where the evidence is relevant and the danger of unfair prejudice does not substantially outweigh its probative value. McKenna v. State, 114 Nev. 1044, 1051-52, 968 P.2d 739, 744 (1998) (citing Pellegrini v. State, 104 Nev. 625, 630-31, 764 P.2d 484, 488 (1988); NRS 48.035(1); NRS 175.552(3)), cert. denied, 528 U.S. 937 (1999). Applying this test, we have held that evidence from which a jury could fairly infer that incarceration will not deter the defendant from endangering others lives is admissible to show his future dangerousness. See, e.g., Leonard v. State, 108 Nev. 79, 82, 824 P.2d 287, 289-90 (1992) (defendant not unfairly prejudiced by admission of evidence of defendant’s escape attempt and other prior crimes). We have also recognized that a defendant’s own statements may constitute such admissible evidence. See, e.g., Witter v. State, 112 Nev. 908, 921, 921 P.2d 886, 895 (1996) (evidence of defendant’s statement that he could heighten his reputation if he were to kill police officers was properly admitted to show future dangerousness); Biondi v. State, 101 Nev. 252, 257, 699 P.2d 1062, 1065 (1985) (evidence of defendant’s death threat to State’s witness and admissions to other witness is admissible to show character and circumstances of offense).
We conclude that Harte’s statements were sufficiently probative of his future dangerousness and that the probative value of the statements was not substantially outweighed by the danger of *1072 unfair prejudice. Therefore, the district court did not err in admitting the statements during the penalty phase of trial. We further conclude that the prosecutor could properly rely on these statements as support for the future dangerousness argument. Cf. Castillo v. State, 114 Nev. 271, 280, 956 P.2d 103, 109 (1998) (holding that future dangerousness argument was properly supported by the evidence, which included defendant’s own statements to psychologist), cert. denied, 526 U.S. 1031 (1999), and corrected on other grounds by McKenna, 114 Nev. at 1058 n.4, 968 P.2d at 748 n.4.
Harte contends that the prosecutor could not properly argue that Harte presented an escape risk, and therefore, a future danger to others, because no evidence showed any past conduct by him in furtherance of escape. He relies on Howard v. State, 106 Nev. 713, 800 P.2d 175 (1990); this reliance on Howard is misplaced. Howard interprets the rule enunciated in Haberstroh v. State, 105 Nev. 739, 782 P.2d 1343 (1989). In Haberstroh, this court declared that where there is evidence of a defendant’s past conduct that supports a reasonable inference that incarceration will not deter the defendant from endangering others’ lives, a prosecutor is entitled to ask the jury to draw that inference. 105 Nev. at 741-42, 782 P.2d at 1344-45. In Howard, this court determined that under the Haberstroh rule, a prosecutor may only argue that a defendant presents a future escape risk where evidence of past conduct supports it. Howard, 106 Nev. at 719, 800 P.2d at 178; accord Emmons v. State, 107 Nev. 53, 61, 807 P.2d 718, 723 (1991). Because no evidence showed any prior escape attempts, the prosecutor could not properly argue that the defendant might escape from prison. Howard, 106 Nev. at 719, 800 P.2d at 178.
However, the Haberstroh “past conduct” rule upon which the Howard decision relied has since been modified to allow future dangerousness arguments based on no other evidence than the violent nature of the offense for which the defendant is being sentenced. See Redmen v. State, 108 Nev. 227, 235, 828 P.2d 395, 400 (1992), overruled on other grounds by Alford v. State, 111 Nev. 1409, 906 P.2d 714 (1995). Therefore, admission of evidence showing past conduct in furtherance of escape is no longer necessary to support an argument that a defendant presents an escape risk where the argument is otherwise supported by reliable evidence.[6] Thus, Harte’s contention lacks merit.

*1073
Mandatory review

In addition to any errors enumerated by Harte, NRS 177.055(2) requires this court to consider:
(b) Whether the evidence supports the finding of an aggravating circumstance or circumstances;
(c) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and
(d) Whether the sentence of death is excessive, considering both the crime and the defendant.
Our review of the record demonstrates that the State proved beyond a reasonable doubt that Harte committed the murder while in the commission of a robbery. See NRS 200.033(4). There is no indication that the sentence was imposed under the influence of passion, prejudice or any arbitrary factor. Moreover, considering the callous, brutal and unprovoked nature of the crime and evidence of Harte’s violent character, we conclude that the sentence of death is not excessive.

CONCLUSION

We conclude that the district court did not err in denying Harte’s motion to suppress his confession, granting the State’s motion to exclude Harte’s expert witnesses from testifying during the penalty phase, or permitting the State during the penalty phase to introduce evidence of Harte’s statements to show his future dangerousness and to argue his future dangerousness based upon that evidence. Further, our mandatory review under NRS 177.055 reveals no indication that Harte’s death sentence was improperly imposed. Accordingly, we affirm Harte’s conviction and sentence of death.

 Evidence related to the Churchill County shooting incident was not admit *1058 ted during the guilt phase of the trial on the instant robbery and murder charges.

 The jury returned verdicts of life without the possibility of parole against Babb and Sirex.

 Miranda v. Arizona, 384 U.S. 436 (1966).

 Harte also argues that his statements that followed his alleged invocation of the right to counsel may not be considered to undermine the effect of his request. He relies on Smith v. Illinois, 469 U.S. 91, 99-100 (1984), which held that where an accused has unambiguously requested counsel all questioning must cease, and an accused’s postrequest responses to further interrogation may not be used to cast doubt on the clarity of his initial request for counsel. However, Harte’s reliance on Smith is misplaced; Harte never unambiguously invoked the right to counsel.

 NRS 175.552(3) provides that, during the sentencing hearing, “evidence may be presented concerning aggravating and mitigating circumstances relative to the offense, defendant or victim and on any other matter which the court deems relevant to sentence, whether or not the evidence is ordinarily admissible.” (Emphasis added.)

 We hereby recognize that Howard and Emmons have been abrogated to the extent that these cases require evidence of past conduct to support an argument of future dangerousness by reason of escape risk.