OPINION
 

 Per Curiam:
 

 During the evening of July 20, 1991, appellant Michelle Lavette Williams took her two-and-one-half-year-old daughter,
 
 *1183
 
 Khalelah, to the cardiac resuscitation room at Washoe Medical Center. According to hospital reports, Williams initially stated that the child had been playing with some other children and had fallen on some rocks. The treating physician, Dr. Curtis Brown, determined that Khalelah was in full cardiopulmonary arrest, meaning that she was not breathing and had no cardiac activity. Despite the hospital staff’s efforts to save the child’s life, she was pronounced dead at 7:58 p.m. Dr. Brown later testified that, in his opinion, Khalelah was dead on arrival in the emergency room.
 

 The child’s autopsy revealed seven fresh external injuries and concluded that Khalelah had bled to death from a massive laceration of her liver. The autopsy also revealed multiple internal and external injuries of various ages, many of which were classified as severe.
 

 Williams was ultimately indicted and tried for one count of murder in violation of NRS 200.010 and NRS 200.030 and one count of child abuse causing death in violation of NRS 200.508. Williams entered a plea of not guilty and not guilty by reason of insanity on both counts. The jury heard expert testimony indicating that the severity and multiplicity of Khalelah’s injuries were not consistent with accidental trauma.
 

 Although Williams acknowledged at trial that she had given Khalelah a spanking on the day in question, she also testified that the child’s injuries were the result of accidents, such as slipping in the tub during the spanking or jumping off of the sink. Officer Jim Duncan of the Reno Police Department, who interviewed Williams several times after Khalelah’s death, testified that after being confronted with the results of the autopsy, Williams admitted to him that a more severe punishment occurred on the day the child died. Additionally, the jury heard evidence that Williams became violent when she consumed alcohol and that she had been drinking alcohol on the date of Khalelah’s death. The jury also heard testimony indicating that Williams had neglected Khalelah in the past and had treated her harshly. Williams, however, presented witnesses who contradicted the State’s evidence.
 

 On the basis of the foregoing evidence and testimony and other evidence presented during the course of the four-day trial, Williams was found guilty of one count of murder in the first degree and was thereafter sentenced to life in prison with the possibility of parole.
 

 DISCUSSION
 

 Williams contends that the district court committed prejudicial error in refusing to admit expert psychiatric testimony on behalf of the defense. Prior to trial, a hearing was held on Williams’
 
 *1184
 
 Motion for Offer of Proof wherein Dr. Jerry A. Howie, M.D., a psychiatrist, stated that he was prepared to testify that Williams suffered from: (1) chronic depression; (2) alcohol abuse disorder; (3) a personality disorder characterized by immaturity, excessive denial, and passive-dependent traits; and (4) below normal intelligence. However, Dr. Howie was not prepared to testify whether Williams could “appreciate the nature and quality of what she was doing or whether she knew it was wrong.”
 

 Because Dr. Howie had no opinion as to whether Williams was legally insane under the M’Naughten standard followed in Nevada,
 
 [1]
 
 the court declined to admit his testimony. Thereafter, Williams’ sought to overturn the ruling by an original petition for a Writ of Mandamus in this court, which was denied on the basis that the issue could be raised on final appeal from any conviction. Williams raised the issue once more at trial without success.
 

 Williams now argues that this ruling was in error because, under Clark v. State, 95 Nev. 24, 27, 588 P.2d 1027, 1029 (1979), the question of sanity is one for the trier of fact and the testimony which Dr. Howie was prepared to provide, though not conclusive, was relevant to the issue of Williams’ sanity. Williams cites in support of this proposition the broad definition of relevance under NRS 48.015, which states: “‘[R]elevant evidence’ means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.” Mindful of the statute, Williams contends that testimony of her mental condition would have a tendency to make the truthfulness of her allegations of insanity more probable than it would be without this evidence, and thus should have been admitted by the district court.
 

 Williams further argues that depriving her of the right to present evidence relevant to her defense violated her Sixth Amendment rights, as well as her rights to due process under the Fourteenth Amendment. In support of this proposition, Williams cites Chambers v. Mississippi, 410 U.S. 284 (1973). The
 
 Chambers
 
 Court observed that “[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense.”
 
 Id.
 
 at 302. Continuing, the Court concluded that it was error for a trial court to exclude hearsay evidence which evinced persuasive assurances of trustworthiness where such exclusion denied the accused a trial “in accord with traditional and fundamental standards of due process.”
 
 Id.
 
 Williams also cites to Vipperman v.
 
 *1185
 
 State, 96 Nev. 592, 596, 614 P.2d 532, 534 (1980), wherein this court ruled that “[t]he due process clauses in our constitutions assure an accused the right to introduce into evidence any testimony or documentation which would tend to prove the defendant’s theory of the case. United States v. Nixon, 418 U.S. 683, 711 (1974); State v. Fouquette, 67 Nev. 505, 514, 221 P.2d 404, 409 (1950) [,
 
 cert. denied,
 
 341 U.S. 932 (1951),
 
 and cert. denied,
 
 342 U.S. 928 (1952)].”
 

 We have concluded that Williams is correct. This court has held that in order to be entitled to a jury instruction on the question of insanity, a defendant need only introduce some evidence, “no matter how weak[,]” tending to show his or her insanity. Aldana v. State, 102 Nev. 245, 246, 720 P.2d 1217, 1218 (1986) (citing Roberts v. State, 102 Nev. 170, 717 P.2d 1115 (1986)). Additionally, under
 
 Vipperman,
 
 Williams should have been allowed to introduce into evidence testimony which even
 
 tended
 
 to support her theory of defense. Since we are unable to view the error as harmless, we are compelled to reverse and remand for a new trial.
 

 We note, for the sake of clarity, that our decision on this point does not negate or attenuate Nevada’s long-established precedent concerning the presumption of sanity and the basis for overcoming this presumption. In
 
 Lewis,
 
 this Court not only followed the M’Naughten definition of insanity, but also adopted the rule that “[t]he presumption of sanity prevails until it is overcome by a preponderance of evidence showing the defendant’s insanity to the satisfaction of the jury.” 20 Nev. at 354, 22 P. at 248-49. In State v. Behiter, 55 Nev. 236, 254-55, 29 P.2d 1000, 1006 (1934), we approved a jury instruction stating that “the evidence of insanity must outweigh and overcome the presumption of . . . sanity in some appreciable degree, and render it more probable that [a defendant] was insane than that he was sane. . . . Insanity is not proved or established by simply raising doubt as to whether it exists or not.”
 
 Clark
 
 also reaffirmed the principle that “insanity is not proved simply by raising a doubt as to whether sanity exists.”
 
 Clark,
 
 95 Nev. at 27, 588 P.2d at 1029.
 

 In the present case, the district court was likely correct in its assessment that the proposed testimony of Williams’ expert fell short of that which would be required to overcome the presumption of sanity, and would at most have “rais[ed] a doubt as to whether sanity [as defined by the M’Naughten standard] exist[ed].” Nevertheless, Williams is correct in asserting that the evidence was relevant to her defense, at least in tending to support her theory of the case, and as such, the evidence should have been presented to the jury. The jury could then have weighed Dr. Howie’s testimony, together with all other evidence,
 
 *1186
 
 to determine whether they, as finders of fact, could decide that which the doctor could not: whether Williams, at the time of the crime, satisfied Nevada law on the issue of her Insanity.
 

 Williams also contends that NRS 200.030, the statute under which she was indicted, is unconstitutionally vague, and therefore void. Although we have already concluded that a new trial is mandated because of our ruling on the first issue, we have elected to also address the issue of the constitutionality of NRS 200.030 in order to eliminate uncertainty on the subject upon retrial. The basis for Williams’ contention regarding the statute is that the statutory term “nonaccidental” is so vague as to render the statute unconstitutional. NRS 200.030 provides in relevant part:
 

 1. Murder of the first degree is murder which is:
 

 (a) Perpetrated by means of poison, lying in wait, torture or child abuse, or by any other kind of willful, deliberate and premeditated killing;
 

 2. Murder of the second degree is all other kinds of murder.
 

 3. The jury before whom any person indicted for murder is tried shall, if they find him guilty thereof, designate by their verdict whether he is guilty of murder of the first or second degree.
 

 6. As used in this section:
 

 (a) “Child abuse” means physical injury of a nonacciden-tal nature to a child under the age of 18 years ....
 

 In support of her assertion that the statute is void for vagueness, Williams notes that during deliberations, the jury requested clarification regarding the statute by submitting the following question to the trial judge: “Your Honor, please define the term non-accidental as it relates to child abuse.” The judge responded by advising the jury that “[t]he terms ‘accidental’ and ‘non-accidental’ have no specific relationship to the charge of child abuse. They have their ordinary meanings.” The jurors were apparently satisfied with the court’s response, given their verdict and the lack of any further communications.
 

 Williams’ legal argument is based upon the two-part test for unconstitutional vagueness enunciated by the United States Supreme Court in Papachristou v. City of Jacksonville, 405 U.S. 156, 162, (1972), which held that a vagrancy ordinance was void for vagueness where it: “‘fail[ed] to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden
 
 *1187
 
 by the statute, United States v. Harriss, 347 U.S. 612, 617 [(1954)], and . . . encourage[d] arbitrary and erratic arrests and convictions.
 
 Thornhill v. Alabama,
 
 310 U.S. 88 [(1940)];
 
 Herndon v. Lowry,
 
 301 U.S. 242 [(1937)].”
 

 Citing Smith v. Goguen, 415 U.S. 566, 574 (1974), Williams maintains that the second part of the test, the potential for arbitrary enforcement, is the more important prong,
 
 [2]
 
 and posits that the present case is analogous to Kolender v. Lawson, 461 U.S. 352 (1983). In
 
 Kolender,
 
 the legislature’s failure to clarify the terms “credible and reliable” in a statute which required loiterers to display “credible and reliable” identification to police officers, resulted in the Court declaring the statute void on its face for being unconstitutionally vague.
 

 In contrast, the State insists that the two-prong test for constitutional clarity is satisfied in the instant case, because section 6(a) of NRS 200.030 provides sufficient notice of the proscribed conduct as the term “nonaccidental” is capable of being understood by individuals of ordinary intelligence.
 
 Harriss,
 
 347 U.S. at 617. The State also contends that use of the term “nonacciden-tal” in the statute provides sufficiently explicit standards for those who enforce it, thus preventing arbitrary or discriminatory enforcement.
 
 See
 
 Grayned v. City of Rockford, 408 U.S. 104 (1972).
 
 [3]
 

 We agree with the State. As the United States Supreme Court held in United States v. Petrillo, 332 U.S. 1, 7-8 (1947) (emphasis added):
 

 The Constitution has erected procedural safeguards to protect against conviction for crime except for violation of laws which have clearly defined conduct thereafter to be punished;
 
 but the Constitution does not require impossible
 
 
 *1188
 

 standards.
 
 The language here challenged conveys sufficiently definite warning as to the proscribed conduct
 
 when measured by common understanding and practices. The Constitution requires no more.
 

 See also
 
 Summers v. Sheriff, 90 Nev. 180, 182, 521 P.2d 1228, 1228 (1974) (quoting
 
 Petrillo
 
 and rejecting argument that use of the term “lewd” caused statute prohibiting lewd or lascivious acts upon or with the body of a child under the age of fourteen to be unconstitutionally vague).
 

 In addition, the Ninth Circuit, in determining that the term “indecent,” as used in “dial-a-porn” regulations, was not unconstitutionally vague, stated:
 

 The constitutional proscription against vague laws is “a basic principle of due process.”
 
 Grayned
 
 v.
 
 City of Rockford,
 
 408 U.S. 104, 108 . . . (1972). Within this doctrine is the idea that persons of ordinary intelligence should have a reasonable opportunity to know what is prohibited and that the standards should be clear enough to curb the danger of arbitrary or discriminatory enforcement. . . . Nevertheless, even in the strictest sense, “due process does not require ‘impossible standards’ of clarity.”
 
 Kolender v. Lawson,
 
 461 U.S. 352, 361 . . . (1983) (quoting
 
 United States v. Petrillo,
 
 332 U.S. 1, 7-8 . . . (1947)). “[W]e can never expect mathematical certainty from our language.”
 
 Grayned,
 
 408 U.S. at 110[.]
 

 Information Providers’ Coalition v. F.C.C., 928 F.2d 866, 874 (9th Cir. 1991).
 

 We conclude that the word “nonaccidental” is not an imprecise or difficult term, the meaning of which persons of ordinary intelligence must guess at in order to know or understand what conduct is prohibited. If anything, the term is more easily understood and has a more generally accepted meaning than the terms “lewd” and “indecent” upheld in the cases quoted above. Any person of ordinary intelligence who contemplates causing the purposeful, or nonaccidental, injury of a child should be readily aware, based upon a plain reading of NRS 200.030(6)(a), that such conduct constitutes child abuse, and, if the abuse results in the death of the child, could subject the perpetrator to a conviction of first-degree murder. Likewise, authorities called upon to enforce the statute should be able to understand the difference between accidental and nonaccidental injuries inflicted upon a child. The statute challenged by Williams is not unconstitutionally vague.
 

 We have reviewed the remaining issues raised by Williams and conclude that they are without merit and need not be addressed.
 

 
 *1189
 

 CONCLUSION
 

 The district court correctly ruled that NRS 200.030 is constitutional. However, in refusing to allow Dr. Howie to testify on Williams’ behalf, the district court erroneously denied Williams her right to present evidence tending to support her theory of the case. The error may not be viewed as harmless. Accordingly, we reverse the judgment of conviction and remand to the district court for a new trial.
 

 [1]
 

 See, e.g.,
 
 Clark v. State, 95 Nev. 24, 27, 588 P.2d 1027, 1029 (1979); State v. Lewis, 20 Nev. 333, 351, 22 P. 241, 247-48 (1889).
 

 [2]
 

 Goguen,
 
 415 U.S. at 574-75, states:
 

 In [non-commercial] cases, perhaps the most meaningful aspect of the vagueness doctrine is not actual notice, but the other principal element of the doctrine — the requirement that a legislature establish minimal guidelines to govern law enforcement. . . . Statutory language of ... a standardless sweep allows policemen, prosecutors, and juries to pursue their personal predilections.
 

 [3]
 

 The
 
 Grayned
 
 opinion explains the second element of the vagueness test as follows:
 

 Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an
 
 ad hoc
 
 and subjective basis, with the attendant dangers of arbitrary and discriminatory application.
 

 Grayned,
 
 408 U.S. at 108-09.