# IN THE SUPREME COURT OF THE STATE OF NEVADA

THOMAS J. COLLMAN,
Appellant,
vs.
WARDEN; AND THE STATE OF
NEVADA,
Respondents.

No. 65509

FILED

NOV 23 2016

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY
CHIEF DEPUTY CLERK

## ORDER OF AFFIRMANCE

This is an appeal from a district court order denying a postconviction petition for a writ of habeas corpus. Seventh Judicial District Court, White Pine County; J. Charles Thompson, Senior Judge.

Appellant Thomas J. Collman was convicted of and sentenced to death for murdering his girlfriend's three-year-old son. Collman met Lory Stach in Las Vegas when Stach's son, Damian, was almost two years old.[1] Stach became pregnant shortly after they began dating and gave birth to Collman's son, Darian, in August 1995. By then, Collman was living in Ely, where he was training to be a prison guard at the Ely State Prison. Stach and the children joined him there not long after Darian's birth. According to Stach and other witnesses, Collman was abusive toward Damian. Throughout the time that he and Stach lived together, Damian almost always had bruises on his body, but they became more prevalent after Stach and the children moved to Ely. By the end of 1995,

---

[1]Because Collman did not include complete trial transcripts, the following facts are taken from this court's opinion in his direct appeal. *Collman v. State*, 116 Nev. 687, 7 P.3d 426 (2000).

Damian had started losing his hair, possibly due to stress, and he had become withdrawn, serious, and sad and was no longer affectionate with Collman.

On the day of Damian's death on January 19, 1996, Collman was home sick. Stach took care of the children in the morning while Collman slept. At about 7:00 a.m., she discovered that Damian had eaten a pack of bubble gum and some taco shells. Stach swatted Damian on his buttocks and sent him to his room. She told Collman about the incident when he woke up around noon. Collman then asked Damian about the incident. When Damian said he did not eat the gum or the taco shells, Collman swatted him for lying and sent him to his room. Around 12:30 p.m., Stach departed to run errands, leaving Collman, Damian, and Darian at the house. According to Collman, after Stach left he saw Damian go into the kitchen trailed by the family dog and then heard Damian scream and a loud thud, like something hit a wall. Collman ran to the kitchen, looked down the stairs leading to the basement, and saw Damian lying at the bottom of the stairs, crumpled up. He attempted cardiopulmonary resuscitation (CPR) on Damian but was unable to do so because the smell of Damian's vomit made Collman feel sick. Collman called Stach who immediately drove home. She encountered Collman running in the street with Damian in his arms. Collman had not called 911, apparently because he believed the ambulance would have to be dispatched from a town approximately 12 miles away, so he and Stach rushed Damian to the hospital.

Although Damian was dead when they arrived at the hospital, medical personnel endeavored for thirty minutes to resuscitate him. Members of the medical staff testified that Damian was nonresponsive,

bluish in color, and exhibited no signs of life when they began lifesaving procedures. They further testified that Damian was covered with overlapping bruises of various ages and possible bite marks. The bruises covered Damian's arms, legs, neck, face, head, abdomen, perineum (the area between the genitals and anus), rectum, penis, and testicles. Due to the amount, age, and areas of bruising, members of the medical staff testified that Damian's injuries were inconsistent with a fall down the stairs. Members of the medical staff testified that a story that the child fell down the stairs, the guardian's failure to call 911, the overlapping bruises of varying ages, and inconsistency of the bruises with the guardian's story are all indicators of child abuse.

Dr. Ellen Clark, the medical examiner who performed the autopsy on Damian, testified that the cause of Damian's death was asphyxia leading to brain swelling, arrhythmia due to bruising around the heart, and/or multiple blunt trauma impact. She explained that Damian apparently died from his body being placed in an awkward position where his knees were very forcefully and acutely bent and pulled all the way up to his chest, compressing his chest muscles. Such compression restricted Damian's breathing and disturbed the regulation of his heartbeat. The trauma would additionally cause fat particles to break off and travel through Damian's body into his lungs and kidneys. The State also presented evidence regarding the apparent bite marks on Damian's body. Dr. Raymond Rawson, a bite mark expert, prepared a forensic report concluding that Damian had nine separate bite marks on his body and that Collman was the biter. Dr. Rawson testified similarly at trial with "a high degree of confidence."

Collman presented three theories of defense. First, he asserted that Damian died from a fall down the stairs, as evidenced by his own testimony that Damian had fallen down the stairs in the family residence and testimony of Dr. Anton Sohn, who opined that Damian died from a spinal cord injury, not blunt trauma. Second, Collman contended that Stach was Damian's abuser and killer. He supported that claim with evidence that Stach abused Damian and was generally a bad mother. Third, he asserted that Damian choked to death, as evidenced by his testimony that Damian had eaten a pack of gum the morning of his death and the testimony of medical personal that they had difficulty putting an endotracheal tube down Damian's throat, indicating a blockage.[2]

The jury convicted Collman of first-degree murder. At the conclusion of the penalty phase, the jury found two aggravating factors: the murder involved torture and Damian was under the age of fourteen. At least one juror found the following mitigating circumstances: Collman had no significant criminal history; he had a history of employment; he cooperated with law enforcement; Stach received a lighter sentence; he did not intend to kill Damian; and he did not flee. After determining that the mitigating circumstances did not outweigh the aggravating circumstances,

---

[2]This evidence was impeached by testimony that the blockage was mucous, which very commonly forms in the throat of abused children due to crying. Additionally, Dr. Clark testified that during the autopsy, she found no gum in Damian's throat. She further stated that had the gum lodged in Damian's throat at 7 a.m., when he ate the gum, he would have choked right away and not five and a half hours later. *Collman*, 116 Nev. at 700, 7 P.3d at 435.

the jury sentenced him to death. This court affirmed the judgment of conviction. *Collman v. State*, 116 Nev. 687, 7 P.3d 426 (2000).

Collman filed a timely postconviction petition for a writ of habeas corpus. After conducting an evidentiary hearing that included testimony from Collman's trial counsel, David Schieck[3] and Scott Bindrup, the district court granted Collman relief as to his claim that the State impermissibly based the torture aggravating circumstance on the felony upon which the felony-murder theory was based in violation of *McConnell v. State*, 120 Nev. 1043, 102 P.3d 606 (2004), and vacated the death sentence and ordered a new penalty hearing. The district court denied the remaining claims in the petition. This appeal followed.[4]

Collman argues that the district court erred by denying a number of claims of ineffective assistance of trial and appellate counsel related to the guilt phase of trial. To establish ineffective assistance of trial counsel, he must demonstrate that counsel's performance was deficient in that it fell below an objective standard of reasonableness, and resulting prejudice such that there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Warden v. Lyons*, 100 Nev. 430, 432-22, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland*). To establish ineffective assistance of appellate counsel,

---

[3]Schieck also represented Collman in his appeal from the judgment of conviction.

[4]Because the State withdrew its cross-appeal, the propriety of the district court's decision as to the torture aggravating circumstance is not before us and we express no opinion on that matter.

Collman must demonstrate that counsel's performance was deficient in that it fell below an objective standard of reasonableness, and resulting prejudice such that the omitted issue would have had a reasonable probability of success on appeal. *Kirksey v. State*, 112 Nev. 980, 998, 923 P.2d 1102, 1114 (1996). We give deference to the district court's factual findings if supported by substantial evidence and not clearly erroneous but review the court's application of the law to those facts de novo. *Lader v. Warden*, 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).

*Stach's mental health evaluation*

Collman contends that trial counsel were ineffective for failing to obtain a copy of Stach's mental health evaluation which, he claims, could have been used to impeach her. The mental health evaluation at issue was prepared in connection with an NRS chapter 432B proceeding related to Collman and Stach's son Darian. Attorney David Lockie represented Stach in that matter and in her criminal case stemming from Damian's death. Lockie decided to have her evaluated "as a preliminary tool" in providing her legal advice. Trial counsel testified at the postconviction evidentiary hearing that they attempted to obtain Stach's mental health evaluation, but Lockie refused to release it based on attorney-client privilege. Believing that the evaluation was privileged, counsel did not pursue the matter further. We conclude that counsel's failure to do more was not objectively unreasonable, as their belief that the evaluation was privileged was legally sound given that Lockie obtained the evaluation to assist him in advising his client and the evaluation was not introduced at any judicial proceeding or otherwise disclosed to a third-party. *See H.A.W. v. State*, 652 So. 2d 948, 949 (Fla. Dist. Ct. App. 1995) ("When a psychotherapist is employed by counsel for a

defendant to assist him in preparing a defense for his client and not to treat the defendant, the state may not depose the expert or call him as a witness; this witness is subject to the attorney-client privilege."); *People v. Hilliker*, 185 N.W.2d 831, 834 (Mich. Ct. App. 1971) (concluding that communications to psychiatrist retained by counsel to assist the defense in preparing for trial were privileged "under the veil of attorney-client privilege"). Accordingly, the district court did not err by denying this claim.[5]

*Brady violation*

Collman complains that trial counsel were ineffective for not pursuing a *Brady v. Maryland*, 373 U.S. 83 (1963), violation on the ground that the State withheld exculpatory and impeachment evidence related to the bite marks on Damian's body. *Brady* and its progeny require the State to disclose evidence that is favorable to the accused when the evidence is material to guilt or punishment. *Strickler v. Greene*, 527 U.S. 263, 280 (1999). To succeed on a *Brady* claim, Collman's counsel would have had to show that the evidence was favorable to him, the State failed to disclose it, and prejudice resulted, that is, the evidence was material. *Id.* at 281-82.

Collman first contends that the State withheld information that the State's investigator obtained opinions from other dentists who believed that Dr. Rawson's bite mark identification findings were "bogus." Schieck testified at the postconviction evidentiary hearing that he learned

---

[5]To the extent Collman contends that trial counsel were ineffective for not calling the psychologist who evaluated Stach, the district court did not err by denying that claim as the attorney-client privilege would have applied and precluded the psychologist's testimony.

before trial that the State's investigator had found other forensic dentists who did not think well of Dr. Rawson's report. Under those circumstances, he explained, the defense could not "in good faith say we were prejudiced by the State's failure to disclose [that information]." We conclude that counsel were not deficient for not pursuing a *Brady* claim that would not have been successful.

Collman next argues that the State withheld a police detective's notes concerning a threat made by State witness Michael Palombo to defense witness Kim Colon. Based on testimony at the evidentiary hearing and trial counsel's inquiries into admitting evidence of the threat at trial,[6] the district court found that counsel was aware of the threat. Although it was not clear how counsel learned about the threats or whether the notes were disclosed, Collman has not identified the contents of the detective's notes or how they were material. Under the circumstances, we agree with the district court that Collman failed to demonstrate a *Brady* violation that objectively reasonable counsel would have pursued.

*Matters related to the Petrocelli[7] hearing*

Collman argues that trial counsel were ineffective in their efforts to present bad act evidence to show Stach's abuse of Damian and her lack of remorse over his death.

---

[6]Counsel apparently abandoned the effort to admit evidence of the threat after the district court's preliminary ruling on the issue indicated that the defense would be opening the door to damaging impeachment evidence against Colon.

[7]*Petrocelli v. State*, 101 Nev. 46, 692 P.2d 503 (1985).

 

First, Collman claims that counsel failed to secure the attendance of several witnesses at the *Petrocelli* hearing or seek a continuance. The district court rejected this claim, concluding that Collman had failed to show that the witnesses were available, the content of their testimony, whether the testimony was admissible, or how the absence of the testimony materially affected the outcome of the trial. He has not demonstrated that the district court's conclusions were erroneous, as he still has not shown that the witnesses were available, the content of their testimony, or prejudice resulting from the absence of their testimony. We therefore conclude that the district court did not err in this regard.

Second, Collman complains that trial counsel should have called Colon to testify regarding Stach's sexual advances toward her and Colon's stepfather to testify about an instance where Stach flirted with him to show Stach's lack of remorse over Damian's death. Collman has not provided the complete transcript of the *Petrocelli* hearing, but based on Schieck's postconviction testimony and our decision on direct appeal, *Collman*, 116 Nev. at 703-04, 7 P.3d at 437, it appears that counsel did present Colon's testimony at the *Petrocelli* hearing, so there was no deficiency in that respect. As to Colon's stepfather, Collman has not shown prejudice even if counsel should have presented his testimony. We therefore conclude that the district court did not err by denying this claim.

Third, Collman argues that trial counsel were not adequately prepared at the *Petrocelli* hearing regarding their efforts to admit evidence of Stach's sexual behavior with her brother's girlfriend to show her lack of remorse over Damian's death. To prove the encounter happened, the defense presented testimony from Collman's parents who witnessed an alleged incident between the women. Their testimony however was

inconsistent even though they testified to the same event. Collman suggests that had counsel been better prepared in handling these witnesses, the trial court would have admitted the evidence. Even if counsel were deficient in preparing for and presenting the conflicting testimony, Collman has not demonstrated prejudice as the jury heard other evidence that more directly suggested Stach's culpability in the abuse and murder, including evidence that Stach abused Damian and was generally a bad mother, *Collman*, 116 Nev. at 699, 7 P.3d at 434, and therefore there is no reasonable probability that evidence of Stach's sexual behavior would have altered the outcome at trial. Therefore, the district court did not err by denying this claim.

*Preservation of evidence*

Collman argues that trial counsel were ineffective for not seeking a dismissal or adverse inference instruction based on the State's failure to collect or preserve the substance that medical personnel at the hospital suctioned from Damian's throat to facilitate intubation. He argues that this evidence was critical in light of evidence introduced at trial that Damian had swallowed a package of gum on the morning of his death and that a possible cause of death was asphyxiation. We conclude that Collman failed to show that counsel's performance fell below an objective standard of reasonableness for two reasons. First, objectively reasonable counsel could decline to make this argument because the evidence was not material considering other evidence that the blockage in Damian's throat was mucous, the medical examiner did not find gum in Damian's throat, and the medical examiner's testimony that "had the gum lodged in his throat at 7 a.m., when he ate the gum, he would have choked right away and not five and a half hours later," *Collman*, 116 Nev. at 700,

7 P.3d at 435. Second, even if the evidence was material, Collman has not established that the failure to gather or preserve it resulted from gross negligence or bad faith and therefore an adverse inference instruction or dismissal would not have been warranted. *See Jackson v. State*, 128 Nev., Adv. Op. 55, 291 P.3d 1274, 1284 (2012). Accordingly, the district court did not err by denying this claim.

*Jury selection*

Collman contends that trial counsel were ineffective for not advancing a for-cause challenge against a juror because she believed that the death penalty was needed, she did not want to sit on the jury, she believed that police officers have "great credibility," she believed that the State would not waste money bringing a defendant to trial if there was not "good evidence against [the defendant]," and she indicated that a criminal defendant should be required to prove his innocence. Collman has not provided the entire transcript of the juror's voir dire, but the transcript excerpts included in the appendices and the portions of the voir dire quoted in the district court's order support the district court's conclusion that Collman had not demonstrated that the juror's "views would prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath." *Weber v. State*, 121 Nev. 554, 580, 119 P.3d 107, 125 (2005) (quoting *Leonard v. State*, 117 Nev. 53, 65, 17 P.3d 397, 405 (2001) (internal quotations omitted)). In particular, the juror said that she would not automatically vote for the death penalty, she would not take a police officer's testimony at "face value" and acknowledged that police officers can make mistakes, and she had no problem with the concept of the State proving someone's guilt beyond a reasonable doubt and that she would hold the State to its burden

of proof. On this record, Collman has not demonstrated that counsel's failure to assert a for-cause challenge to this juror fell below an objective standard of reasonableness. We therefore conclude that he has not shown that the district court erred by denying this claim.

*Change of venue*

Collman contends that trial counsel should have accepted the prosecutor's offer to stipulate to a change of venue or filed a motion for a change of venue due to the prejudicial atmosphere in the small community of Ely. Schieck's postconviction testimony indicates that he was not opposed to holding the trial in Ely because the defense expected to introduce some of Stach's bizarre behavior and "a jury in a small town may better serve [the defense's] purpose." He also explained that because Collman was employed by the prison and had made friends in the area, Ely was a better venue. Schieck acknowledged that there was a great deal of publicity surrounding the case but thought that it was helpful when newspaper headlines reported that the trial court was keeping evidence away from the media, so the jury pool would know that they were not aware of all the evidence. Counsel's testimony shows a reasonable strategic decision. Collman has not demonstrated extraordinary circumstances to support a challenge to that decision. *See Howard v. State*, 106 Nev. 713, 722, 800 P.2d 175, 180 (1990) (observing that trial counsel's strategic or tactical decisions are "[v]irtually unchallengeable absent extraordinary circumstances"), *abrogated on other grounds by Harte v. State*, 116 Nev. 1054, 1072 n. 6, 13 P.3d 420, 432 n. 6 (2000). Nor has he demonstrated prejudice as he has not included complete transcripts of the voir dire and therefore we have no basis on which to conclude that the trial court would have approved a stipulation or granted a motion to

change venue. Accordingly, he has not demonstrated that the district court erred by denying this claim.

*Bite mark evidence*

Collman argues that trial counsel were ineffective for a number of reasons related to the bite mark evidence introduced at trial.

First, Collman argues that trial counsel were ineffective for not challenging the State's disclosure of an amended report from Dr. Rawson immediately before his testimony, seeking a continuance, moving to exclude the amended report, or challenging its admission on appeal. Because he has not included Dr. Rawson's initial and amended reports in the appendices or explained the significance of any differences in the two reports, he has not satisfied the deficiency prong of *Strickland*. But even if counsel were deficient, he has not established prejudice due to his failure to provide complete trial transcripts so that we can assess counsel's efforts in challenging Dr. Rawson's testimony and the significance of the bite mark evidence in relation to the other evidence supporting his guilt.[8] We therefore conclude that the district court properly denied this claim.[9]

---

[8]The district court concluded that the State did not rely heavily on Dr. Rawson's testimony and the excerpt provided of the prosecutor's closing argument supports the district court's characterization of the State's position in that the prosecutor argued that even if the jury disregarded the bite mark evidence, other evidence pointed to Collman's guilt.

[9]Collman contends that appellate counsel was ineffective for not challenging the untimely disclosure and admission of Dr. Rawson's amended report. We conclude that he has not shown that appellate counsel was ineffective for the same reasons that the trial-counsel claim fails. Therefore, the district court did not err by denying this claim.

Second, Collman complains that trial counsel were ineffective for not discrediting Dr. Rawson with available impeachment evidence. In denying this claim, the district court observed that Schieck was aware of at least some of the information presented by an expert at the evidentiary hearing but acknowledged the difficulty of impeaching Dr. Rawson about opinions he had given in prior cases, indicating that Schieck made a strategic decision in this respect. The district court also indicated that the new expert testimony was along the same lines as that of the three defense experts who testified at trial and questioned Dr. Rawson's opinions and testimony. Collman has not provided this court with trial transcripts that would bring those findings into doubt. Therefore, we conclude that he has not shown that the district court erred by denying this claim. *See Elam v. Denney*, 662 F.3d 1059, 1065 (8th Cir. 2011) (observing that the "failure to present cumulative evidence does not constitute ineffective assistance of counsel") (internal quotation marks omitted); *Lara v. State*, 120 Nev. 177, 180, 87 P.3d 528, 530 (2004) (observing that "trial counsel's strategic or tactical decisions will be virtually unchallengeable absent extraordinary circumstances") (internal quotation marks omitted).

Third, Collman argues that his conviction is invalid because bite mark analysis as it existed in 1997 was scientifically unreliable and Dr. Rawson's testimony exceeded what was supported by the evidence. This claim could have been raised on direct appeal and Collman has not articulated good cause for failing to raise it on direct appeal. *See* NRS 34.810(1)(b)(2). But even if he established good cause, he cannot demonstrate prejudice, as it appears that other evidence was introduced to establish his guilt, *Collman*, 116 Nev. 693-700, 7 P.3d at 431-35, and the

district court found that the State did not rely heavily upon Dr. Rawson's testimony. To the extent that this claim could be interpreted as an ineffective-assistance claim, trial counsel presented testimony from three experts to rebut Dr. Rawson's testimony and Collman has failed to show that counsel were deficient for not presenting additional expert testimony.

Fourth, Collman contends that the district court erred by precluding him from presenting evidence at the evidentiary hearing as to the current state of the science of bite mark identification to show that his conviction is invalid. His claim lacks merit. The district court did not categorically preclude him from presenting more recent evidence about the state of bite mark identification, as Collman's expert witness addressed bite mark identification studies conducted between 2007 and 2010 in his testimony at the evidentiary hearing. Regardless, concerns about the reliability of bite mark identification are not new and the district court noted that reliability of the State's evidence in this respect was challenged at trial through three defense experts.[10] And Collman has not provided this court with trial transcripts that would refute the district court's findings.

*Failure to call witnesses*

Collman argues that trial counsel were ineffective for not calling a number of expert witnesses at trial.

---

[10]Collman fails to explain how a challenge to his conviction based on present-day evidence criticizing the science of bite mark identification is appropriately raised in a postconviction habeas petition since it does not appear to implicate a claim that the conviction was obtained in violation of the federal or state constitution or state law. *See* NRS 34.724(1).

Supreme Court
of
Nevada

(O) 1947A

First, Collman argues that trial counsel were ineffective for not introducing a child abuse expert to explain the possibility of "episodic abuse" of Damian by Stach to counter the testimony describing Stach as a loving mother. To support his claim, Collman introduced testimony from a clinical psychologist, who suggested that several stressors in Stach's life increased her risk of being an abuser and that she may have suffered from mental health problems. Those conclusions were based on the expert's interviews with people who knew Stach and review of various records; Stach refused to speak with him. The expert acknowledged that he could not really offer a diagnostic opinion about Stach. We conclude that testimony from a child abuse expert who had not evaluated Stach was unnecessary and far less compelling than the testimony from several witnesses who observed Stach's abuse of Damian and testified at trial. As such, Collman has not demonstrated that trial counsel's failure to present a child abuse expert fell below an objective standard of reasonableness.[11] *See State v. Moody*, 132 P.3d 985, 998 (Kan. Ct. App. 2006) (concluding that trial counsel was not ineffective for failing to call an expert on the effects of drug use where defendant's coconspirators and other witnesses admitted to extensive use during cross-examination at trial); *State v. Walker*, 235 P.3d 766, 770 (Utah Ct. App. 2010) (concluding that trial counsel was not ineffective for failing to call a mental health expert to testify about the defendant's post-traumatic stress disorder where counsel was able to address the defendant's condition through cross-examination

---

[11]We also note that the testimony of a child abuse expert would not have successfully countered the undisputed evidence that Damian was in Collman's exclusive care when the fatal injuries occurred.

of lay witnesses). We therefore conclude that the district court did not err by denying this claim.

Second, Collman argues that trial counsel should have presented an expert to explain the mechanics of a low level fall consistent with the configuration of the stairs at issue. To support his claim, he presented testimony from a biomedical engineer who opined that there was a "potential for quite a large fall" on the steps in the home and that "such a fall could result in a fatal head injury." The expert did not dispute that Damian was an abused child, nor could he say that Damian fell down the stairs or died as a result of such a fall, just that it would be incorrect to suggest that a short fall could not result in death. We conclude that Collman has not shown that trial counsel were deficient for not presenting such speculative testimony. Moreover, his failure to provide complete trial transcripts renders it nearly impossible to question the district court's conclusion that there is no reasonable probability of a different outcome at trial had a similar expert been called to testify at trial.

Third, Collman contends that trial counsel should have presented testimony from a forensic pediatric pathologist. At the postconviction evidentiary hearing, two medical experts opined that short falls can result in significant head injuries and death in children. They both acknowledged that Damian was a child abuse victim and that he did not have the kind of injuries they would expect to see with a fatal fall; however, they could not rule out such a fall as the cause of Damian's death or determine the cause and manner of his death. We conclude that Collman has not demonstrated that trial counsel's performance was deficient or that he was prejudiced. He has not shown that trial counsel were deficient as they relied on Dr. Sohn, who provided testimony

consistent with the defense theory that Damian fell down the stairs, rather than continuing to search for other experts to provide similar testimony that Damian could have died as the result of a fall down the stairs. *Cf. In re Gomez*, 325 P.3d 142, 152 (Wash. 2014) (finding no ineffective assistance where trial counsel presented expert who provided testimony consistent with defense theory and explaining that counsel is not required to search country for experts to find multiple witnesses who could provide most favorable opinion for the defense). And given the speculative nature of the postconviction testimony and Collman's failure to provide the trial transcripts to dispute the district court's determination that the outcome of the trial would have been no different with this new testimony, he has not demonstrated prejudice. Therefore, he has not shown that the district court erred by denying this claim.

*Impeachment matters*

Collman contends that trial counsel were ineffective for failing to challenge the testimony of several witnesses with available impeachment evidence.

First, Collman contends that trial counsel should have cross-examined the State's rebuttal child abuse expert, Dr. David Chadwick, using evidence that he had wrongfully accused defendants of criminal conduct in several unrelated cases. In rejecting this claim, the district court noted that trial counsel were aware of other cases in which Dr. Chadwick testified and cross-examined him on at least one such case. Collman has not provided trial transcripts to dispute the district court's finding in this respect and given that finding, it does not appear that the district court erred in determining that the scope of the cross-examination was the result of a reasonable strategic decision. The district court also

SUPREME COURT
OF
NEVADA

(O) 1947A

18

determined that Collman was not prejudiced by the failure to cross-examine Dr. Chadwick regarding additional unrelated cases. Given Collman's failure to provide complete trial transcripts, he has not shown that the district court erred in that respect.

Second, Collman argues that counsel should have impeached Stach with letters she wrote to him before she and the children joined him in Ely. He asserts that the letters show that Stach was not the loving mother she was portrayed to be at trial and that he and Damian had a good relationship. The district court concluded that although the letters were not used in cross-examining Stach, Collman had not shown deficiency or prejudice in light of the "intense" and lengthy cross-examination that covered "[m]any of the subjects contained in the two letters." We conclude that Collman has not shown that the district court erred for two reasons. First, he has not provided complete trial transcripts, so he has not shown that the district court's characterization of the cross-examination is inaccurate. Second, our opinion on direct appeal refers to evidence presented by the defense regarding Stach's abusive behavior toward Damian, *Collman*, 116 Nev. at 699, 7 P.3d at 434, which further supports the district court's conclusion that the letters would not have affected the outcome at trial.

Third, Collman complains that trial counsel should have impeached Stach and Michael Palombo with evidence that they were romantically involved at the time of trial to show their bias. He presents nothing more than a perfunctory argument that appears to be belied by the record. In particular, trial counsel cross-examined Palombo about his relationship with Stach and elicited testimony that he became involved in a relationship with Stach after Damian's death and that they were living

together at the time of trial. Because Collman has not shown that trial counsel were deficient, the district court did not err by denying this claim.

Fourth, Collman contends that trial counsel were ineffective for not impeaching Palombo with evidence that he intimidated Colon at her workplace. It appears that trial counsel made a strategic decision not to present this evidence. The evidence was addressed in a hearing outside the jury's presence, where the trial court indicated that it was inclined to allow the defense to present the evidence but that if the defense did so, the State would be allowed to cross-examine Colon about her sexual encounters with Collman and Palombo. The district court concluded that counsel made a tactical decision to not pursue the threat evidence and therefore were not deficient; nor had Collman demonstrated prejudice. Collman has not shown that the district court's findings were erroneous.

*Prosecutorial misconduct and inadmissible statements by witnesses*

Collman contends that trial counsel were ineffective for not objecting to inadmissible statements and opinions made by a number of witnesses, including: (1) the prosecutor presumed his guilt during the questioning of Stach; (2) the testimony of a friend, a police investigator, and a social worker in which they suggested that Damian's injuries were not consistent with a fall down stairs was improper because they were not experts qualified to express such an opinion; (3) Dr. Rawson's testimony that a bite mark that left extensive bruising on Damian's arm would have been painful was speculative and therefore improper; and (4) during a defense expert's testimony, the prosecutor badgered the expert, was improperly argumentative, proposed a number of improper hypotheticals, and accused the expert of "blindsiding" the State. Even if trial counsel should have objected to any of these instances, Collman has not shown

prejudice for two reasons. First, he has not provided complete trial transcripts and therefore has not provided support for any conclusion that objections to these instances had a reasonable probability of changing the outcome at trial. Second, based on the limited record before us, it appears that the complained-of testimony and conduct was relatively brief and unlikely to have had any significant influence on the jury's verdict. Therefore, we conclude that the district court did not err by denying this claim.[12]

*Jury view of the stairs*

Collman argues that trial counsel were ineffective for not requesting a jury view of the stairs where the defense contended that Damian fell and sustained the fatal injuries. Schieck's postconviction testimony indicates that he believed that the photographs sufficiently illustrated the configuration of the stairs, and Collman has not established that a jury view of the stairs would have altered the outcome of the trial. We therefore conclude that the district court properly denied this claim. *Cf. Davis v. State*, 107 Nev. 600, 604, 817 P.2d 1169, 1172 (1991) (rejecting ineffective-assistance claim based on trial counsel's failure to request that the jury be allowed to view murder scene where counsel testified that he did not believe in-person view would have added anything to the

---

[12]Collman argues that trial counsel were ineffective for not objecting to instances of prosecutorial misconduct where the prosecutor repeatedly referred to Damian's death as a "murder" or "killing," argued facts not in evidence, misstated the evidence, provided copies of dental casts and then attempted to discredit the source of the dental casts on voir dire. Because he has presented nothing more than bare allegations of misconduct, no relief is warranted.

SUPREME COURT
OF
NEVADA

(O) 1947A

photographs of the scene admitted at trial and appellant otherwise failed to demonstrate how a jury view would have helped his case), *overruled on other grounds by Means v. State*, 120 Nev. 1001, 103 P.3d 25 (2004).

*Alleged violation of SCR 250*

Collman contends that trial counsel were ineffective for not ensuring that numerous bench conferences were recorded as required by SCR 250(5)(a). He challenges the district court's denial of his claim because he did not "specify the subject matter of the bench conferences or explain their significance," pointing to counsel's testimony that, in the unrecorded bench conferences, the trial court pressured the parties to keep the case moving along and the pressure negatively affected his performance. We conclude that the district court did not err by denying this claim. Counsel's testimony is insufficient to support the claim because it was general in nature and identified no specific argument or issue that was not recorded or any particular action that counsel failed to take as a result of the alleged pressure to move the case long. Collman still has not identified any issue that could not be raised or reviewed on direct appeal due to an unrecorded bench conference.

*Jury instructions*

Collman argues that trial and appellate counsel should have challenged the malice-aforethought jury instruction. Although trial and appellate counsel did not challenge the instruction, this court addressed the issue sua sponte on direct appeal. We concluded that the instruction improperly relieved the State of its burden of proving that Collman acted with malice aforethought by allowing the jury to presume malice "simply from his commission of child abuse," *Collman*, 116 Nev. at 720, 7 P.3d at 447, but determined that the error was harmless because it was "clear

that the jury believed that Collman acted with malice and thus would have found him guilty of murder even absent the erroneous instruction" in light of other instructions given, *id.* at 720, 723-24, 7 P.3d at 447, 449. Given this ruling, even if trial and appellate counsel had challenged the instruction, doing so would not have changed the outcome of the trial or had a reasonable probability of success on appeal.[13] Therefore, the district court did not err by denying this claim.

Collman next contends that trial and appellate counsel were ineffective for not challenging the jury instruction defining child abuse on the ground that the phrase "physical injury of a nonaccidental nature" is unconstitutionally vague and overbroad as it could include any form of discipline or corporal punishment and result in strict criminal liability for nonaccidental injury. We conclude that the district court did not err by denying this claim, as his challenge to the instruction is a bare allegation unsupported by any legal authority and we have held, in *Williams v. State,*

---

[13]Collman also complains that this court erred by determining that the erroneous malice-aforethought instruction was harmless because at least one juror found as a mitigating circumstance during the penalty phase that Collman lacked an intent to kill and because prejudice must be presumed. We conclude that no relief is warranted as the opportunity to challenge this court's ruling was in a petition for rehearing. Moreover, we addressed the lack-of-intent mitigating circumstance, explaining that the jury did not have to find intent to kill in order to find implied malice. *Collman,* 116 Nev. at 723-24, 7 P.3d at 449. Finally, he provides no persuasive legal authority supporting his contention that prejudice must be presumed, and we rejected a similar argument on direct appeal (that the instructional error was structural requiring automatic reversal without consideration of prejudice), *id.* at 720, 7 P.3d at 447.

110 Nev. 1182, 1188, 885 P.2d 536, 540 (1994), that this statutory definition of child abuse is not unconstitutionally vague.[14]

Having considered Collman's claims and concluded that no relief is warranted, we

ORDER the judgment of the district court AFFIRMED.[15]

_____, C.J.
Parraguirre

_____, J.
Hardesty

_____, J.
Douglas

_____, J.
Gibbons

_____, J.
Pickering

---

[14]Collman raises four claims could have been raised on direct appeal: (1) he did not receive a fair trial before an impartial court, (2) his trial was unfair due to financial constraints placed on his case by White Pine County, (3) the State failed to provide timely discovery, and (4) his conviction and sentence are constitutionally invalid because the statutory reasonable doubt instruction minimized the State's burden of proof. Because he has not shown good cause for his failure to raise these claims on direct appeal, we need not consider them. *See* NRS 34.810(1)(b)(2).

Collman argues that the district court erred by denying his claim that the cumulative effect of the errors raised in this appeal require reversal of the judgment of conviction. Even assuming that he has shown that trial counsel's performance was deficient for the reasons alleged, he has not demonstrated prejudice given the inadequate record he has provided in this appeal. Therefore, no relief is warranted.

[15]The Honorable Nancy M. Saitta, Justice, having retired, this matter was decided by a six-justice court.

CHERRY, J., dissenting:

I cannot agree with the majority's conclusion as to Collman's claim that prior counsel were not ineffective for failing to challenge the bite mark opinion evidence.

As noted by the majority, Damian was subjected to brazen cruelty that resulted in his death. Collman asserted, among other defenses, that he was not responsible for the abuse inflicted upon Damian. Notably, both Collman and Stach were near Damian shortly before he was found unresponsive. Therefore, scientific evidence purporting to settle the question of who abused Damian is of crucial importance. It was incumbent on the State to present scientifically legitimate evidence and on defense counsel to strenuously challenge that testimony. Based on the record before this court, that did not occur.

Bite mark comparison evidence was first used in 1954 to identify a burglar who pilfered, among other things, a bite of cheese. Paul C. Giannelli, *Forensic Science: Why no Research?*, 38 Fordham Urban L.J. 503, 505 (2010); *see* M. Chris Fabricant, *The Shifted Paradigm: Forensic Science's Overdue Evolution from Magic to Law*, 4 Va. J. Crim. L. 1, 38 (Spring 2016) (noting the first time bite mark evidence used to identify a mark left on a victim occurred in *People v. Marx*, 126 Cal. Rptr. 350 (Cal. Ct. App. 1975)). The evidence became more popular when it was used to great effect, along with hypnotically refreshed testimony, in the trial of Ted Bundy. Paul C. Giannelli, *Criminal Discovery, Scientific Evidence, and DNA*, 44 Vand. L. Rev. 791, 792 (1991). Similar expert testimony had been introduced in hundreds of cases and was considered valid at the time of Collman's trial. *See* Steven Weigler, *Bite Mark Evidence: Forensic Odontology and the Law*, 2 Health Matrix 303, 322 (1992). Although

juries are not instructed to weigh scientific evidence more heavily than other forms of evidence, they expect scientific evidence and tend to give it more weight than traditional evidence. *See United States v. Arenal*, 768 F.2d 263, 270 (8th Cir. 1985) (recognizing that juries may give more weight to testimony with the "aura of expertise"); Erica Beecher-Monas, *Reality Bites: The Illusion of Science in Bite-Mark Evidence*, 30 Cardozo L. Rev. 1369, 1371 (2009) (recognizing that the "trappings of science" associated with bite mark evidence are persuasive to juries); Michael Mann, *The "CSI Effect": Better Jurors Through Television and Science?*, 24 Buff. Pub. Int. L.J. 211, 227 (2006) (noting that jurors take notice when no scientific evidence is offered). However, in recent years, this evidence has proven unreliable.

> The science behind bite-mark testimony is murky at best. The underlying theory, that a mark found on a dead victim can be traced to the dentition of the perpetrator, is dubious. The uniqueness of human dentition is questionable, and there is little empirical support for such a proposition.

Beecher-Monas, *supra*, at 1371. It has contributed to the conviction of many individuals for serious crimes who have later been exonerated by legitimate scientific evidence. *Id.* at 1373-74.

Comparably, Collman was convicted of first-degree murder, the most serious offense in this State based in part, on "junk" science. He faces at the very least, a significant term of incarceration. At the very worst, he could receive a death sentence. While Collman bore the burden of producing the necessary transcripts and documents to evaluate the merits of his claim, *see* NRAP 10(b)(1), I contend that his failure to do so should not alleviate this court's obligation to address those merits. Given the dubious nature of the evidence he now challenges and the effect it had

SUPREME COURT
OF
NEVADA

(O) 1947A

on the verdict, I would order postconviction counsel to file complete transcripts and reports so that this court may evaluate the claim.

_____, J.
Cherry

cc:    Chief Judge, The Seventh Judicial District Court
Hon. J. Charles Thompson, Senior Judge
Nathalie Huynh
Law Office of Thomas L. Qualls, Ltd.
Attorney General/Carson City
White Pine County District Attorney
White Pine County Clerk

SUPREME COURT
OF
NEVADA

(O) 1947A